UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHANDLER HOMES, L.L.C., a Washington limited liability company,<br><br>                      Plaintiff,<br><br>          v.<br><br>TOLL BROS., INC., a Pennsylvania company,<br><br>                      Defendant. | Case No. C21-382-RSM<br><br>ORDER |

## I.     INTRODUCTION

This matter comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. #16) and Defendant's Cross-Motion for Summary Judgment and Motion to Strike Portion of Inadmissible Testimony (Dkt. #23). Defendant opposes Plaintiff's Motion (Dkt. #23) and Plaintiff opposes Defendant's Motions (Dkt. #29). The Court has reviewed the Motions, the submissions filed in support of and in opposition thereof, the relevant portions of the record, and the applicable law. Being fully advised, the Court DENIES Plaintiff's Motion for Summary Judgment, GRANTS Defendant's Motion for Summary Judgment, and GRANTS IN PART Defendant's Motion to Strike.

ORDER - 1

## II. BACKGROUND

Plaintiff Chandler Homes, L.L.C. ("Chandler") and Defendant Toll Bros., Inc. ("Toll") are real estate development companies, the former a Washington limited liability company and the latter a Pennsylvania corporation. Dkt. #1-1 ¶¶ 1–2; Dkt. #16 at 1. On January 4, 2018, Chandler purchased property in Kirkland, Washington to develop a condominium project. Dkt. #16 at 3 (citing Dkt. #17 at 1–2). At or around the same time, Toll was under contract to purchase an adjacent property on which it intended to develop a 16-townhome community marketed and referred to in the pleadings as "Crosswater." Dkt. #23 at 3. On February 13, 2018, Chandler and Toll entered into an Agreement for Easement and Utilities (hereinafter, the "Agreement"). Dkt. # 17, Ex. A. Per the Agreement, the parties would grant each other easements benefiting each other and construct utilities at locations benefiting both parties' properties. *Id*. at 1 (Recitals). In exchange, Toll was to "compensate Chandler and share in the cost of utility construction." *Id.*

Under the Agreement, Toll paid Chandler an initial cash payment of $40,000, plus $290,000 after Toll closed on Crosswater. *Id.* §§ 1–2. Toll also agreed to make Chandler principal Sheri Putzke (also a real estate agent) the listing agent for the homes at Crosswater at a 4.5% overall commission. *Id.* § 12. Section 3 of the Agreement provided for a final payment as follows:

> Final Payment to Chandler. If Toll closes on the purchase of the Toll Property and constructs homes thereon, Toll shall make a final payment to Chandler within sixty (60) days after the closing of the sale of the last home in the Toll development ("Final Payment"). The Final Payment shall be computed based upon the following formula:
>
> 50% of the positive difference (if any) of [x - $13,200,000.00]
>
> X = The aggregate of the base sales price for all 16 homes sold by Toll plus all lot premiums.

ORDER - 2

> The base sales price is the price for a basic spec level home charged by Toll. The base sales price does not include lot premiums, options, upgrades or cash and noncash incentives. Toll shall have sole and absolute discretion over the setting and adjusting of the base sales prices and lot premiums. However, the base sales price for the homes constructed on the Toll Property shall be no less than the base sales price for the same model home located at similar Toll projects in King County at the time the condominium on the Toll Property opens for sale. In the event that Toll (i) does not construct homes on the Toll Property, and (ii) conveys the Toll Property to a third-party residential developer/builder, Toll shall pay Chandler the sum of five-hundred thousand dollars ($500,000.00) ("Conveyance Fee") within fifteen (15) business days after closing on such third-party sale. Chandler and Toll agreed to grant each other certain easements to facilitate the development and construction of condominiums on their adjacent properties in Kirkland, Washington.

*Id.* § 3.

The parties executed the Agreement without addressing the City of Kirkland's requirement to include Affordable Housing Units ("AHUs") in certain developments. Chandler began development on its property and obtained required permits in 2017. *See* Dkt. #17 at 2. At the time, a Kirkland ordinance mandated construction of a certain number of AHUs or payment of a fee in lieu of building an AHU. *Id.* Chandler decided to pay the fee and executed an agreement with the city accordingly. *Id.* Toll began the permitting process for its development in 2018. *See* Dkt. #1-1 at 4. Toll built and sold 16 homes. *Id.* At this time, the option to pay a fee in lieu of building an AHU, previously allowed by the Kirkland ordinance, had expired. Dkt #16 at 7; Dkt. #23 at 6. As required by the ordinance, Toll designated and sold one of the 16 units as an AHU for $439,129. *See* Dkt. #23 at 9. The remaining 15 units were sold at prices (minus lot premiums) between $824,995 to $1,099,995. *Id.* Subsequently, the parties amended the Agreement twice to incorporate certain provisions, none of which were related to the issue in dispute. *See* Dkt. #16 at 8. Chandler argues that the parties' negotiation assumed a minimum "base sale price" of $825,000, which explains the $13,200,000 figure used in the parties' agreed upon profit sharing formula. *Id.* at 2. Thus, Chandler argues, Toll breached their Agreement when it used the AHU's sale price (approximately half of the agreed

ORDER - 3

upon minimum) in its calculations and owes Chandler an additional $192,935.50. *Id.* at 3. Toll argues that the plain terms of the Agreement set no such minimum "base sales price" and that it complied with the Agreement in using the AHU's sales price in its calculations. Dkt. #23 at 2–3.

On February 19, 2021, Chandler filed the present litigation in King County Superior Court, and Toll subsequently removed the case to this Court. Dkt. #1. On September 23, 2021, Chandler moved for summary judgment. Dkt. #16. On October 7, 2021, the parties filed a stipulated motion regarding a briefing schedule for cross-motions for summary judgment, which was granted. Dkts. #21–22. Toll subsequently filed its cross-motion for summary judgment and response on October 25, 2021, and included a motion to strike.

### III.   ANALYSIS

#### IV.   Motion to Strike

Pursuant to Fed. R. Civ. P. 56(c)(2), Toll argues that the Court should strike paragraph 16 of the Declaration of Mark Putzke ("Putzke Decl.") (Dkt. #17) and paragraphs 3 and 4 of the Second Declaration of Mark Putzke ("Second Putzke Decl.") (Dkt. #27). *See* Dkt. #23 at 11–12; Dkt. #29 at 11–12. When ruling on a motion for summary judgment, "a trial court can only consider admissible evidence." *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir.2002). Toll claims that this evidence is inadmissible hearsay, lacks foundation, and lack personal knowledge of the facts set forth.

In paragraph 16 of the Putzke Decl., Mr. Putzke states that "At the time of the Agreement, the base sales price for a spec level home charged by Toll was $895,000." Dkt. #17 ¶ 16. Mr. Putzke then states that the $13.2 million used to calculate Chandler's share of profits "was negotiated and agreed to by the parties to represent a base sales price of at least

ORDER - 4

$825,000, times 16, the number of units that were to be built." *Id.* Toll argues that the statement "the base price of a spec level home charged by Toll was $895,00" is absent any indicia of personal knowledge and is instead Mr. Putzke's own subjective interpretation of the term "base sales price" in the Agreement. Dkt. #23 at 12. In response, Chandler argues that this statement is in fact founded upon Mr. Putzke's personal knowledge and experience as managing member of Chandler with more than 20 years of experience developing properties and because he personally negotiated the Agreement with Toll. Dkt. #26 at 13. The Court GRANTS Toll's motion to strike paragraph 16 of the Putzke Decl. to the extent it states Toll's intent as to the meaning of the term "base sales price."

In paragraph 3 of the Second Putzke. Decl., Mr. Putzke states:

> Informed by market research and the knowledge and experience of Chandler Homes L.L.C. member, Sheri Putzke (real estate agent with more than 15 years of experience selling homes on the Eastside and greater-Seattle area, who had previously sold numerous homes for Defendant, Toll Bros., Inc. ("Toll")), Chandler determined that $895,000 was what the market would bear for the homes sold at Crosswater.

Dkt. #27 ¶ 3. Toll argues that Mr. Putzke must offer testimony from his personal knowledge (not on behalf of "Chandler") and cannot recite hearsay from Sheri Putzke. Dkt. #29 at 11. The Court disagrees that this paragraph seeks to introduce hearsay statements from Sheri Putzke. The Court also finds that as managing member of Chandler (Dkt. #27 ¶ 1), he may speak to conclusions reached by the company of which he has personal knowledge. The Court DENIES Toll's motion to strike paragraph 3 of the Second Putzke Decl.

In paragraph 4 of the Second Putzke Decl., Mr. Putzke states:

> Chandler and Toll negotiated and agreed that $825,000 would be the minimum base sales price per unit. Obviously, the lower this number was, the more profit Chandler would realize under the Agreement. This agreement represented a minimum per unit profit of $35,000, as it is 50% of the difference between $895,000 and $825,000.

ORDER - 5

Dkt. #27 ¶ 3. Toll argues that this paragraph offers only Mr. Putzke's conclusory interpretation of what the parties "agreed to," which is inadmissible as subjective intent regarding the meaning of a contract's term. The Court finds that Mr. Putzke could present this evidence in an admissible *form* at trial. *See* Fed. R. Civ. P. 56(c)(2). Therefore, the Court will consider it and DENIES Toll's motion to strike paragraph 4 of the Second Putzke Decl. However, as explained further, the Court does not find the evidence creates a genuine issue of material fact.

### A. Legal Standard

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could

ORDER - 6

reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge."  *Anderson*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).  When cross motions are at issue, the Court must "evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006).

Here, both Chandler and Toll move for summary judgment on Chandler's breach of contract claim.

**B. Breach of Contract Claim**

When interpreting contracts, the court's primary objective is to "discern the parties' intent." *Supervalu Holdings, Inc. v. Barbara Morris Testamentary Tr.*, No. C09-5351BHS, 2010 WL 3947500, at *5 (W.D. Wash. Oct. 6, 2010).  Washington follows the "objective manifestation theory of contracts," which instructs courts to determine the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).  Courts may "impute an intention corresponding to the reasonable meaning

ORDER - 7

of the words used," *Martin v. Smith*, 368 P.3d 227, 230 (Wash. 2005), and "can neither disregard contract language ... nor revise the contract under a theory of construing it," *Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 1980).  Generally, courts give words in a contract "their ordinary, usual, and popular meaning," which can be ascertained by reference to standard English dictionaries.  *Hearst*, 115 P.3d at 267; *Supervalu Holdings*, 2010 WL 3947500, at *5.  "[T]he interpretation of an unambiguous contract is a question of law."  *Paradise Orchards Gen. P'ship v. Fearing*, 94 P.3d 372, 377 (Wash. Ct. App. 2004).

Washington has "recognized the difficulties associated with interpreting contracts solely on the basis of the 'plain meaning' of the words in the document" and thus adopted the "context rule," which allows courts to "examin[e] the context surrounding an instrument's execution."  *Hearst*, 115 P.3d at 266.  "If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties."  *Id.*  However, extrinsic evidence cannot be used to "show an intention independent of the instrument" or to "vary, contradict or modify the written word."  *Id.* at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (1999)).

At issue here is the meaning of the term "base sales price" as used in Section 3 of the Agreement.  In Section 3, "base sales price" is defined as follows:

> The base sales price is the price for a basic spec level home charged by Toll.  The base sales price does not include lot premiums, options, upgrades or cash and non-cash incentives.

ORDER - 8

Dkt. #17, Ex. A § 3.  Further, Section 3 gives Toll "sole and absolute discretion over the setting and adjusting of the base sales prices and lot premiums.  *Id.* [1] However, Section 3 limits Toll's discretion by requiring that "the base sales price for the homes constructed on the Toll Property shall be no less than the base sales price for the same model home located at similar Toll projects in King County at the time the condominium on the Toll Property opens for sale."  *Id.*

In its motion for summary judgment, Chandler argues that "the formula adopted by the parties clearly contemplated a base sales price of at least $825,000, as when divided by 13,200,000, the total is 16—the number of units in Toll's development."  Dkt. #16 at 13.  Thus, Chandler claims that Toll breached the Agreement when it used the AHU's sale price as the "base sales price" when calculating Chandler's profit share.  Dkt. #16 at 13–14.  Chandler does not complain of the "base sales price" used for any other lot, including lot no. 6 and lot no 12, which were set at $814,995 and $824,995—both under $825,000.  *See* Dkt. #17, Ex. E.

Toll disputes that the parties ever agreed to a $825,000 floor and that such a floor would contradict the plain language of the Agreement.  Dkt. #23 at 18. Toll argues that Chandler's position that a minimum "base sales price" of a basic spec level home of $825,000 must be derived because $13,200,000 divided by 16 is $825,000 does not reflect the text of the Agreement.  Dkt. #23 at 19.  Toll reiterates that the profit share in Section 3 is calculated as follows:

> 50% of the positive difference (if any) of [x - $13,200,000.00]

---

[1] Chandler states that prior to the initial execution of the Agreement, Toll provided it with a first draft followed by a second draft. Dkt. #26 at 8. Chandler argues that the sentence "Toll shall have sole and absolute discretion over the setting and adjusting of the base sales prices and lot premiums" was provided in the second draft but was not redlined, i.e., Chandler would have had to compare the two drafts or carefully read the second draft to identify the additional sentence as it was not in red and underlined text. *Id.* The Court is not persuaded it must ignore or discredit this sentence given the lack of redlining. "[A] party to a contract which he has voluntarily signed will not be heard to declare that he did not read it or was ignorant of its contents.'" *In re Marriage of Schweitzer*, 132 Wash.2d 318, 329, 937 P.2d 1062 (1997) (quoting *Nat'l Bank v. Equity Invs.*, 81 Wash.2d 886, 912, 506 P.2d 20 (1973)).

ORDER - 9

> X = the aggregate of the base sales price for all 16 homes sold by Toll plus all lot premiums.

*Id.* (citing Dkt. #17, Ex. A § 3). Toll argues that Chandler is looking at the wrong part of the equation: Base sales price is used to calculate "X," not $13,200,000 and that in confusing one for the other Chandler ignores that if the parties shared an understanding that the single "base sales price" under the Agreement was $825,000, there would be no need to describe the profit share's "X" as the "The aggregate of the base sales price for all 16 homes old by Toll" (plus all lot premiums). *Id.* Toll argues that the parties could have simply stated, "13,2000,000 plus all lot premiums" minus $13,2000,000. *Id.* Or more simply, "All lot premiums." *Id.*

Toll argues that it correctly set the base price of the AHU, lot no. 15, at $439,129 as it was "no less than the base sales price for the same model home located at similar Toll projects in King County at the time the condominium on the Toll Property open[ed] for sale" as required by Section 3 of the Agreement. Dkt. #23 at 8; *see also* Dkt. #17, Ex A § 3. Toll explains that when it constructs condominium developments every unit is not the same, but that Toll utilizes several difference models, each with their own floor plans, features, square footages, and base sales prices. *Id.* at 7 (citing Dkt. #25 ¶ 6). In the case of the AHU, Toll used its "Kiteon model." *Id.* at 8. The AHU was the only lot to use that model at Crosswater. *Id.* Toll argues that it had used the "Kiteon model" at a prior Kirkland community for other affordable units at which homes were sold from August 2017 through February 2019, the last of which closed in March 2019—both units were sold for under $439,129. *Id.*

However, Chandler argues that $825,000 had to represent a floor of Chandler's earning potential per unit, because if the "base sales price" of each home was $825,000, Chandler's share of profits (excluding lot premiums) would be $0. Dkt. #16 at 13. In response, Toll points back to the language of the Agreement. Dkt. #23 at 20. First, Toll argues, the Agreement does

ORDER - 10

not speak to a minimum revenue sharing calculation per unit, but sets the floor above which revenue sharing occurs in the aggregate of $13,200,000. *Id.* Second, Toll argues the Agreement sets the actual floor for a "base sales price" at "no less than the base sales price for the same model home located at similar Toll projects in King County." *Id.* (citing Dkt. #17, Ex. A § 3). And third, Toll argues that the Agreement contemplates a scenario where Chandler makes no profit at all. *Id.* The Agreement allows Chandler to share in the "*positive* difference *(if any)* of [x - $13,200,000.00]." *Id.* (citing Dkt. # 17, Ex. A § 3) (emphasis added).

At the outset, the Court must determine whether the Agreement's language regarding "base sales price" is clear as a matter of law; if it is, then the Court must grant Toll's motion for summary judgment; if not, then the Court must determine whether an examination of the extrinsic evidence submitted by the parties so clarifies the intent of the parties that the Court can determine it as a matter of law. The Court agrees that the language of the Agreement is clear in that it does not contemplate a specific minimum "base sales price" for calculating Chandler's profit share but refers to the "base sales price" charged by Toll so long as that price is above the "same model home located at similar Toll projects in King County at the time the condominium on the Toll Property open[ed] for sale." *See* Dkt. #17, Ex. A § 3. The Agreement is also clear in that it contemplates a scenario where Chandler makes no profit in specifically allowing Chandler to share the "*positive* difference *(if any)* of [x - $13,200,000.00]." Dkt. # 17, Ex. A § 3 (emphasis added). Under Washington law, "[c]ourts do not have the power to rewrite a contract that the parties have deliberately made for themselves." *Eagle Harbour Condo. Ass'n v. Allstate Ins. Co.*, No. C15-5312 RBL, 2016 WL 499301, at *2 (W.D. Wash. Feb. 9, 2016) (citing *Chaffee v. Chaffee*, 19 Wash.2d 607, 625, 145 P.2d 244 (1943)).

ORDER - 11

While the Court finds the language of the Agreement plain and unambiguous it has considered the extrinsic evidence submitted by Chandler and comes to the same result. Chandler argues that the context rule makes Toll's breach of the Agreement clear. First, Chandler argues that the subject matter and objective of the contract support the fact that $825,000 is, at a minimum, the base sales price to be used Section 3's profit sharing calculation. Chandler states that while the Agreement affords Toll the "sole and absolute discretion over the setting and adjusting of the base sales price and premiums," its discretion to do so does not eradicate the purpose of the agreement which was to facilitate the development of the parties' respective projects through the grant of easements—easements particularly valuable to Toll, which was the only party responsible for providing compensation related to the grant of any said easement. Dkt. #16 at 15. Chandler also points to deposition testimony wherein Toll described the purpose of the Agreement was for both parties to "win." Dkt. #26 at 17. While the Court recognizes purpose of the Agreement, extrinsic evidence cannot be used to "vary, contradict or modify the written word." *Hearst*, 115 P.3d at 267 (quoting *Hollis*, 974 P.2d at 843). The written word of the Agreement clearly contemplates a scenario where Chandler does not make a profit, and therefore contemplates a scenario where the "base sales price" is below $825,000. *See* Dkt. # 17, Ex. A § 3.

Second, Chandler similarly argues that the Agreement must have provided Chandler "with a reasonable, but in the grand scheme of the development, modest amount of profit in exchange for certain easements" and that "Toll's attempt to pass of the 'loss' it may have sustained from the sale of an AHU amongst its other premium units, cannot be permitted." Dkt. #16 at 16. Again, the written terms of the Agreement say otherwise—clearly contemplating a scenario where Chandler leaves with no profit at all under Section 3.

ORDER - 12

Third, Chandler argues that Toll's conduct underscores its breach. *Id.* Chandler argues that because Toll never discussed an AHU during contract negotiations despite two amendments to the Agreement and never informed Chandler prior to the AHU's construction, the "base sales price" should not be less than $825,000. *Id; see also* Dkt. #26 at 3–4. In response Toll argues that Chandler was on notice of Kirkland law requiring the building of an AHU. Dkt. #23 at 22.

Finally, Chandler argues that Toll's position is ultimately unreasonable. *Id.* at 16–17. Chandler argues that under Toll's position "it could have constructed and sold all the units as AHUs and remained in compliance with the Agreement's terms." *Id.* Chandler states that the terms of the Agreement set forth a basis for "Chandler to share in a specific, reasonable amount of profit from the sale of the condominiums at Crosswater." *Id.* But that is not what the Agreement says. Chandler is afforded a share of the "*positive* difference *(if any)*." Dkt. # 17, Ex. A § 3 (emphasis added). The Court may not rewrite the Agreement now that Chandler is disappointed with its result.

### V. CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS:

1) Plaintiff Chandler's Motion for Summary Judgment (Dkt. #16) is DENIED.

2) Defendant Toll's Cross-Motion for Summary Judgment (Dkt. #23) is GRANTED. The clerk is directed to enter judgment in Toll's favor with Chandler taking nothing on its claims in this case.

3) Defendant Toll's Motions to Strike (Dkts. #23, 29) are GRANTED IN PART.

ORDER - 13

4) Should Defendant Toll wish to seek attorneys' fees, it is directed to file a motion with the Court.

5) The parties' Stipulated Motion Regarding Amended Case Scheduling Order (Dkt. #39) is DENIED AS MOOT.

6) This case is CLOSED.

DATED this 12th day of January, 2023.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER - 14